IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

ROCK HILL DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK USER ID<br><br>https://www.facebook.com/donnie.wright.3914<br><br>THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS OR FACEBOOK, INC. | MISC. No. 0:23-cr-00517 |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Andrew Greer, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, depose and state:

**I.     INTRODUCTION AND PURPOSE OF APPLICATION**

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is the Facebook account with account identifier https://www.facebook.com/donnie.wright.3914 and profile name "Donnie Wright" (hereinafter the **TARGET ACCOUNT**), as further described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

1

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846 have been committed by Alexander "Donnie" WRIGHT, a suspected narcotics dealer in Chester County, SC. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## II.     AGENT BACKGROUND

4. I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

5. I am currently employed by the United States Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), as a Special Agent ("SA") in Charlotte, NC and have been since February 2022. I am a graduate of the Federal Law Enforcement Training Center (FLETC), graduating with both their Criminal Investigative Training Program (CITP) and Homeland Security Special Investigations Special Agent Training (HSISAT) certifications. Prior to my tenure as an HSI SA, I was a United States Customs and Border Protection Officer ("CBPO") from December 2013 until February 2022 in Charlotte, NC. During my tenure as a CBPO, I was a Task Force Officer ("TFO")

with HSI in Charlotte, NC from March 2017 through February 2022.

6. In the course of my duties, I have worked as a lead case agent, directing investigations concerning bulk cash smuggling, money laundering, narcotics importation and distribution, and financial fraud. I have become familiar with and utilized a wide variety of investigative techniques including, but not limited to surveillance, the issuance of subpoenas, phone toll analysis, various financial checks and analysis, trash pulls, search warrants, the use of confidential sources of information, and the use of pen registers/trap and trace devices. I have participated in the execution of numerous search warrants. I have initiated, executed, and been involved in investigations resulting in numerous arrests for narcotics violations, bulk cash smuggling, and fraud offenses, including possession with the intent to distribute and the importation of controlled substances, wire fraud, and bulk cash smuggling. I have interviewed defendants, witnesses, and informants concerning the illegal trafficking of controlled substances, bulk cash smuggling, and financial frauds.

### III.     PROBABLE CAUSE

7. In October 2022, HSI Charlotte, in conjunction with the Federal Bureau of Investigations ("FBI") and the Chester County Sheriff's Office Narcotics and Violent Crimes Unit ("NVCU"), began investigating Alexander "Donnie" WRIGHT ("WRIGHT"), a suspected narcotics dealer in Chester County, SC. In February 2023, law enforcement applied for and received an order authorizing law enforcement to install a pole camera in the vicinity of 125 MLK Memorial Drive, Chester, SC 29706 ("TARGET RESIDENCE"). The TARGET RESIDENCE is known to be utilized by WRIGHT.

8. Law enforcement has monitored the pole camera and observed suspected drug activity at the TARGET RESIDENCE on multiple occasions. On April 13, 2023, law enforcement conducted enforcement activity involving individuals arriving at the TARGET RESIDENCE and departing shortly after arrival. Specifically, investigators observed a red in color Hummer bearing South Carolina License Plate Number UVE-955 arrive at the TARGET RESIDENCE and saw a female, later identified as Kayla ISOM, exit the passenger's side of the Hummer, and walk to the back of the TARGET RESIDENCE. A few minutes later ISOM reappeared and was observed walking to the front of the TARGET RESIDENCE with an African American male fitting the physical description of WRIGHT. Thereafter, ISOM entered the Hummer and the Hummer departed.

9. Law enforcement followed and a marked unit with the Chester County Sherriff's Office ("CCSO") conducted a traffic stop with the Hummer and discovered Travis SANDERS in the driver's seat and ISOM in the passenger's seat. A subsequent probable cause search of the Hummer resulted in the discovery of suspected methamphetamine, fentanyl analogue, cocaine, and marijuana.

10. ISOM and SANDERS informed investigators post-Miranda that the narcotics discovered in their vehicle was received from an individual they know as "Donnie". ISOM admitted to going to the TARGET RESIDENCE and purchasing narcotics from "Donnie" before the traffic stop occurred. Furthermore, ISOM advised that "Donnie" stores narcotics in a structure behind the TARGET RESIDENCE.

11. Additionally, on April 13, 2023, while monitoring the pole camera, investigators observed a Volvo bearing South Carolina License Plate Number 5429LC arrive at the TARGET RESIDENCE for a short duration before departing.

12. Law enforcement followed and a marked unit with CCSO conducted a traffic stop with the Volvo and discovered Sylvia Mobley in the driver's seat and William "Trey" MOBLEY in the backseat. A subsequent probable cause search of the Volvo resulted in the discovery of approximately one (1) gram of marijuana in MOBLEY's possession. MOBLEY had a Family Court Bench Warrant and was subsequently arrested.

13. Since May 2023, law enforcement conducted multiple controlled buys with WRIGHT using a confidential informant (CI).[1] On each occasion, WRIGHT sold narcotics (methamphetamine or fentanyl analogue) to the CI in exchange for cash. To date, WRIGHT has sold approximately 136 suspected fentanyl pills and approximately 122 grams of suspected methamphetamine to the CI. The controlled purchases occurred in the curtilage of the TARGET RESIDENCE, either in the structure located at the back of the TARGET RESIDENCE, or in vehicles parked in the driveway.

14. On May 31, 2023, investigators were made aware of a death in Chester County, SC suspected to be the result of an overdose. The victim was identified as MOBLEY. (See paragraph 12 above). Law enforcement obtained a search warrant for MOBLEY's cellular phone and analyzed the data.

15. Investigators discovered communication through Facebook Messenger between MOBLEY and the **TARGET ACCOUNT**. Photographs linked to the **TARGET ACCOUNT** have been positively identified as WRIGHT by HSI, FBI, and NVCU who compared the **TARGET ACCOUNT** photographs to photos of Alexander "Donnie"

---

[1] The CI is agreeing to work for law enforcement in exchange for prosecutorial leniency with pending state charges in South Carolina. To date, the CI has provided information that has been independently corroborated by law enforcement and has not given any indication they are unreliable.

WRIGHT from law enforcement databases. Moreover, the profile name on the **TARGET ACCOUNT** matches WRIGHT's last name and WRIGHT's known alias, "Donnie".

16. On April 13, 2023, MOBLEY and WRIGHT had the following conversation on Facebook Messenger that based on my training, experience, and knowledge of this investigation, is indicative of drug trafficking activity. WRIGHT communicated from the **TARGET ACCOUNT**.

| | |
|---|---|
| MOBLEY: | Yoooo ima swing by like 15 mins |
| WRIGHT: | What you need |
| MOBLEY: | Downtown n prolly few blues. U said u would lookout for me last nught for taking that to Kayla? |
| WRIGHT: | I'm give yu a free. |
| MOBLEY: | Ok I'm finna pull up |
| WRIGHT: | Ok me to |

17. On April 16, 2023, MOBLEY's account had the following conversation with WRIGHT. The conversation indicates that MOBLEY's mother utilized the account to inform WRIGHT of MOBLEY's arrest and to warn WRIGHT of law enforcement. WRIGHT communicated from the **TARGET ACCOUNT**.

| | |
|---|---|
| MOBLEY: | Trey wanted me to tell you he locked up for child support after leaving you house. He says be careful. He thinks they watching your house. |
| WRIGHT: | Ok bet |
| MOBLEY: | Sorry I didn't tell you this is his mom. |
| WRIGHT: | Ok I'm look around my house se see |

18. On May 28, 2023, MOBLEY and WRIGHT had the following conversation on Facebook Messenger that based on my training, experience, and knowledge of this

6

investigation is indicative of drug trafficking activity. WRIGHT communicated from the **TARGET ACCOUNT.**

| | | |
|---|---|---|
| WRIGHT: | | How many blue yu need |
| MOBLEY: | | Prolly 10 |
| WRIGHT: | | Yu want the 5$ or 3$ |
| MOBLEY: | | 3$ |

19. On May 30, 2023, MOBLEY sent the following messages to the **TARGET ACCOUNT** that based on my training, experience, and knowledge of this investigation, is indicative of drug trafficking activity.

| | | |
|---|---|---|
| MOBLEY: | | My ride otw to me now |
| MOBLEY: | | Ima have dubski |
| MOBLEY: | | Otw |
| MOBLEY: | | Finna pull up |

20. Contraband sellers and customers frequently use code words for slang to evade law enforcement detection. The conversation above indicates that MOBLEY was informing WRIGHT that he had a "dubski", or $20, for the purchase of narcotics. Investigators ascertained through MOBLEY's cellular phone that MOBLEY sent $20, via CashApp, to Dee Wright with CashApp moniker $Dwright0824 on May 30, 2023. The profile picture for Dee Wright is the same picture utilized for the background picture on the **TARGET ACCOUNT**. Additionally, the profile name on the **TARGET ACCOUNT** matches WRIGHT's last name and another known alias for WRIGHT, "Dee".

21. Investigators noticed that WRIGHT unsent all the responses to MOBLEY's sent messages. Furthermore, MOBLEY's Facebook Messenger account documented

that WRIGHT unsent the messages on May 31, 2023, the day MOBLEY was discovered deceased from a suspected overdose.

22. Given the recency of these communications related to drug trafficking coming from the **TARGET ACCOUNT**, and evidence that WRIGHT unsent messages after conducting a suspected drug transaction with MOBLEY, there is probable cause to believe that evidence of those crimes is still in possession of Meta Platforms, Inc.

23. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

24. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

25. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's

"Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

26. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

27. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

28. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video

and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

29. Facebook users can use Facebook Messenger to communicate with other users via text, voice, and video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

30. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

31. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

32. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

33. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

34. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

35. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of that application may appear on the user's profile page.

36. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

37. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

38. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the

11

communications.

39. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

40. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## IV. INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

41. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the Government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, Government-authorized persons will review that information to locate the items described in Section II of Attachment B. Agents will then segregate and seal all items that were not lawfully seized.

## V. CONCLUSION

42. Based on the information above, I have probable cause to believe that on computer systems owned, maintained, and/or operated by Meta Platforms, Inc., 1601 Willow Road, Menlo Park, CA, exists evidence and instrumentalities of violations of 21 U.S.C § 841, 18 U.S.C. § 922(a)(1)(a), and 18 U.S.C. § 924(c). Therefore, I request that the Court issue the proposed search warrant.

43. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The Government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

44. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated," 18 U.S.C. § 2711(3)(A)(i), and "is in . . . a district in which the provider . . . is located or in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(ii).

## VI.    REQUEST FOR SEALING

45. I further request that the Court order that the affidavit, Attachment A, and Attachment B, in support of this application be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

This affidavit has been reviewed by Assistant United States Attorney William K. Witherspoon.

I declare under penalty and perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____
Andrew J. Greer
Special Agent
Homeland Security Investigations

SWORN TO ME VIA TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS AND SIGNED BY ME PURSUANT TO FED. R. CRIM. P. 4.1 AND 4(d).
This 28th day of June, 2023
Columbia, South Carolina

_____
The Honorable Shiva V. Hodges
UNITED STATES MAGISTRATE JUDGE

15